[No. 30056. Department One. June 24, 1947.]

E. S. PRENTICE, *Appellant,* v. UNION PACIFIC RAILROAD COMPANY, *Respondent.*

E. S. PRENTICE, *Appellant,* v. YAKIMA VALLEY TRANSPORTATION COMPANY, *Respondent.*[1]

[1]Reported in 182 P. (2d) 41.

*Halverson & Applegate,* for appellant.

*Roy F. Shields, V. O. Nichoson,* and *Hamblen, Gilbert & Brooke,* for respondent.

SIMPSON, J.—These actions were instituted to collect the value of four cars of pears, two of which were claimed to have been converted by defendants, while the other two were destroyed through negligent handling by defendants. The answers denied the charges contained in the complaints and set up counterclaims for transportation charges. The case was tried to the court, sitting without a jury. At its conclusion, the court made findings of fact and conclusions of law, and entered a judgment in favor of defendants.

Plaintiff has appealed and, in so doing, assigns error on the part of the trial court as follows: in refusing to hold that appellant's damage was the f.o.b. price of the pears; in refusing to hold that the railroad company had notice of the sale by appellant to Gruber & Mintzer; in holding that the evidence submitted as to the market value of the fruit in New York at the time and place of conversion was insufficient to establish appellant's damage; in holding that respondents had properly and timely notified appellant that the two cars of fruit were at destination and rejected by the consignee; in entering judgment in favor of respondents; and, in refusing to grant motion for a new trial.

The facts are: Appellant, E. S. Prentice, is an individual doing business under the assumed name of Prentice Packing and Cold Storage Company. The Union Pacific Railroad Company and the Yakima Valley Transportation Company are common carriers. December 3, 1941, appellant sold five cars of pears to the firm of Gruber & Mintzer, of New York City. The sale was handled by appellant and George Stone acting as agent for Gruber & Mintzer. Just prior to the consummation of the sale, Stone made an inspec-

tion of the pears, which were kept loose in boxes in cold storage. Stone instructed the appellant to wash, sort, and ship the pears immediately. This was done, though appellant advised that the fruit should be precooled after washing, and then shipped under ice. The pears were shipped without icing, with the plugs and vents in the cars closed.

The confirmation of sale provided that: "time of shipment" should be "prompt"; the type of shipment should be, "Plugs in—vents closed—Rule 76." It acknowledged a down payment of five hundred dollars and named the selling price per box, according to grade and size.

The five cars of fruit were delivered to respondents for shipment. Respondents did not have a part in, or knowledge of, the manner in which the pears were treated, loaded, or shipped. Cars PFE 15026 and PFE 41447 were turned over to the Yakima Valley Transportation Company for shipment, while cars PFE 75224 and PFE 14635 were delivered to the Union Pacific Railroad Company for transportation. A bill of lading, designated as "UNIFORM STRAIGHT BILL OF LADING," was issued on each of the cars. Each car was "Consigned to PRENTICE PACKING & STORAGE CO., ADVISE: GRUBER MINTZER Destination NEW YORK."

Each bill of lading contained the following provision:

"Subject to Section 7 of conditions, if this shipment is to be delivered to the consignee without recourse on the consignor, the consignor shall sign the following statement:

"The carrier shall not make delivery of this shipment without payment of freight and all other lawful charges."
                    "PRENTICE PACKING & COLD STORAGE CO."
                         " (Signature of Consignor.) "

An invoice was made out covering each car, which was attached to a draft in the amount of the invoice and delivery order, and sent to a New York bank as directed by Mr. Stone. The delivery order, directed to "LOCAL FREIGHT AGENT ERIE R. R.," stated:

"Upon surrender of this order, and upon payment of all freight, refrigeration, and other charges, this is your authority to deliver, without the surrender of the original bill of lading, to Gruber & Mintzer, owners, of your city Car PFE 41447 Containing 720 boxes Pears."

There is no evidence in the record which in any way shows that respondents had any knowledge of the existence of the drafts, or that they were forwarded for collection.

When cars 15026 and 75224 arrived at New York, they were delivered to Gruber & Mintzer without payment of the drafts. The contents of cars 14635 and 41447 were rejected by Gruber & Mintzer, and then sold by the railroad companies for a very small amount. After the last-mentioned cars arrived in New York, the following telegrams were exchanged by appellant and Gruber & Mintzer:

"PRENTICE PACKING AND COLD STORAGE CO YAKIMA WASH

"REFERENCE TO FIVE CARS WINTER NELLIS ALL CARS ARRIVED IN A VERY BAD DETERIORATED CONDITION PFE 41447 GOVERNMENT REPORT READS 50 TO 80% AVERAGE 65% DECAY. RD. 20534 READS 25 TO 65% AVERAGE 45 % DECAY PFE 75224 AND PFE 15026 CAR DOOR INSPECTION SHOWS AVERAGE 6 AND 7% DECAY HAVING GOVERNMENT INSPECTORS INSPECT LAST CAR AND WILL ADVISE RESULTS. CAR 20534 SOLD AT AUCTION YESTERDAY PRIOR TO RECEIPT OF INSPECTION CERTIFICATE AND HOLDING YOU FOR ENTIRE LOSS AS CAR WILL NOT BRING FREIGHT VERY AFRAID BOARD OF HEALTH CITY OF NEW YORK WILL CONDEMN MERCHANDISE ADVISE QUICK DISPOSITION OF THE OTHER FOUR CARS AS THIS FRUIT UNFIT FOR HUMAN CONSUMPTION GRUBER & MINTZER."

"GRUBER AND MINTZER

"THESE PEARS SOLD FOB YAKIMA ALL GOVERNMENT INSPECTIONS SHOW GOOD CONDITION WHEN LOADED REASON FOR DECAY SHIPPING WITHOUT ICE ALSO CARS HELD ON TRACK TWO TO SIX DAYS AFTER ARRIVAL WITHOUT ICE WE HAD GOVERNMENT INSPECTION YESTERDAY SAME LOTS PEARS STILL IN STORAGE HERE SHOWED NO DECAY TWO PERCENT RIPE WE TOLD STONE PEARS SHOULD BE ICED HE LOOKED AT PEARS WHILE SAME BEING PACKED SAID SHIP PLUGS IN VENTS CLOSED WE FORCED TO CONCLUSION YOUR RESPONSIBILITY NOT OURS

"PRENTICE PACKING & COLD STORAGE CO. 301 P."

"GRUBER AND MINTZER

"MR. MINTZER YOUR AGENT GEORGE STONE BOUGHT THESE PEARS FROM US ABSOLUTELY UNSOLICITED INSTRUCTED US TO PACK AND LOAD SOON AS POSSIBLE LOAD PLUGS IN VENTS CLOSED THIS ENTIRELY CONTRARY OUR IDEA HANDLING WINTER PEARS THEY SHOULD HAVE BEEN PRECOOLED AT LEAST FORTY EIGHT HOURS AFTER PACKING AS WASHED IN HOT SOLUTION THIS NECESSARILY WILL START DETERIORATION OF FRUIT PARTICULARLY WHEN SHIPPED WITHOUT ICE WHEN STONE INSTRUCTED US SHIP

WITHOUT ICE WE INSISTED ON DEPOSIT FIVE HUNDRED DOLLARS ACCEPTANCE HERE ON GOVERNMENT INSPECTIONS AS VERY DOUBTFUL ARRIVAL CONDITION WHEN SHIPPED UNDER THESE CONDITIONS AS FAR WE CONCERNED THESE PEARS BOUGHT AND ACCEPTED HERE BY YOUR AGENT          PRENTICE PKG AND STG CO."

It is admitted that the fruit was spoiled when the cars were unloaded in New York City.

The trial court held that the proof showed a conversion of cars 15026 and 75224, but that there had been a failure to prove damages. As to car 14635, the court held that notice of rejection was timely given. The court decided that timely notice was not given as to car 41447, but that appellant had failed to prove damages. It was the conclusion of the trial court that the measure of damages for conversion was the value of the fruit in New York City. It is appellant's contention that the measure of damages was the price for which the pears were sold at Yakima. Respondents take the position that there was no conversion of cars Nos. 15026 and 75224, that notice was properly given, and that, in any event, the damages occasioned to the pears was caused by the manner in which they were shipped.

There is a serious question as to whether there was a conversion of the pears in New York. The fruit was shipped by straight bill of lading, consigned to appellant, "ADVISE: GRUBER MINTZER." The method of preparing the pears for shipment, the manner of transportation in the cars, and the way in which the invoices and drafts were made out and handled, were all unknown to respondents.

■ Drafts attached to a bill of lading constitute positive instruction to the carrier to collect before delivery of the order. A violation of the instruction constitutes conversion on the part of the carrier. However, in the case at bar, it does not appear that the carriers knew of the drafts or invoices.

For the purpose of decision, we will assume a conversion.

■ The general rule is that the measure of damages in cases of this nature is the value of the goods at the time of conversion—that is, at the time and place of delivery.

"The measure of damages for conversion by a carrier of goods intrusted to it for transportation and delivery ordinarily is the value of the goods at the time and place of the conversion, or place of destination." 13 C. J. S. 376, Carriers, § 184.

To the same effect, see the statement of the rule and cases cited in 56 A. L. R. 1171.

█ Appellant calls our attention to the following sections of our uniform sales act: Rem. Rev. Stat., §§ 5836-18, -19, -20, and -22 [P.P.C. § 859-3, -5, -7, -11], and then argues that, when the pears were placed on board the cars, title passed to Gruber & Mintzer; further, that the fruit was delivered to the carriers at the buyer's risk, but appellant retained a possessory interest in the shipment to secure the payment of the money owing from the buyer. The argument may be sound when properly applied, but it does not have any application here, because respondents were not advised of any interest retained by appellant.

We are cited to the case of *Inland Seed Co. v. Washington-Idaho Seed Co.*, 160 Wash. 244, 294 Pac. 991, as determinative of the questions presented in the case at bar. In that case, the seller of the peas brought an action against the buyer for their price. This court simply held that the title had passed to the buyer. Clearly, that decision cannot have a bearing upon the question of the carriers' responsibility in this case.

We are in accord with the trial court in holding that damages in a case of this nature are the price of converted goods at the point of destination.

█ With this rule in mind, we must ascertain the value of the fruit when it arrived in New York. Again, we concur in the holding of the trial court that the evidence submitted was not sufficient upon which to base a finding of the market value in New York.

Appellant testified:

"Q. Now, you spoke about the market price here of the pears. You didn't know what the market price was back in New York? A. Oh, yes, we knew what the market price was back in New York. Q. You didn't attempt to testify

as to that, as to the market value— A. No. Q. —— at the time these cars were received back there? A. No, I hadn't."

Appellant's manager, C. W. Bunting, testified:

"Q. Now, you spoke about the market value. You were speaking about the market value on the day the cars were shipped from here? A. I don't know whether I answered or understood that question clearly. Do you mean the actual market value as shown by the auctions on those days or the actual value of these particular pears after transportation charges were added? Q. No, I mean the actual value on the market back in New York on the day these cars arrived? A. That's an awful tough question to answer. That price might have been more. One car might bring $2.00, the next two twenty-five, the next one three, depending on the order in line. Q. Your answer to Mr. Halverson's question didn't cover that particular situation? A. My answer to Mr. Halverson's question, as I understood it, was that he wanted to know what the value of these pears were delivered in New York. In this particular case, the value of these pears was the F.O.B. price plus transportation costs. Q. F.O.B. price in Yakima? A. That's right: plus transportation costs. Q. You didn't attempt to say what the auction sale price, market price, was in New York? A. At that particular day of arrival? Q. Yes. A. No; but I could give it to you, I think, by referring to the records."

We must repeat that this evidence was insufficient on which to base any conclusion relative to value. The evidence just set out, and our conclusion, apply to the contents of cars 14635 and 41447.

The evidence in this case demonstrates the fact that the destruction of the pears was due entirely to the manner in which they were treated and placed in the cars for shipment. The telegrams of December 20, 1941, sent by appellant to Gruber & Mintzer, heretofore set out in this opinion, and the following testimony of Mr. Bunting, given after describing the manner in which the pears were packed:

"Q. In your opinion, that was not the proper way to load these pears? A. Absolutely not; should have been shipped under ice. Q. You would expect them to deteriorate? A. We would expect they would have a good chance of

doing it, yes. Q. You don't know what the market value of these pears was in the condition they were in when they arrived? A. No, I did not, because I didn't see the pears," bears out the conclusion just stated.

The judgment of the trial court is correct and is therefore affirmed.

MALLERY, C. J., MILLARD, SCHWELLENBACH, and ABEL, JJ., concur.

